**The Morrow Firm, P.C.**
Xinlin Li Morrow (SBN 281707)
100 Bayview Cir, Suite 100
Newport Beach, CA 92660
Telephone: (213) 282-8166
Email: xinlin@morrowfirm.com

*Attorney for Plaintiff Tianjin River West Real Estate Development Co., Ltd.*

Electronically FILED by Superior Court of California, County of Los Angeles 7/31/2023 10:19 PM David W. Slayton, Executive Officer/Clerk of Court, By Y. Ayala, Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

**TIANJIN RIVER WEST REAL ESTATE DEVELOPMENT CO., LTD.**, a Chinese Limited Company,

Plaintiff,

vs.

**COLE MATTHEW HARRIS**, an individual, and **YING CHEN aka CINDY CHEN**, an individual,

Defendants.

**Case No.** 23STCV18046

**COMPLAINT FOR**

**(1) FRAUD**
**(2) AIDING AND ABETTING FRAUD**
**(3) BREACH OF FIDUCIARY DUTY**
**(4) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(5) CIVIL CONSPIRACY**
**(6) UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

Plaintiff Tianjin River West Real Estate Development Co., Ltd. (“River West”), for its complaint against Defendants Cole Matthew Harris and Ying Chen, alleges as follows:

**PARTIES**

1. Plaintiff Tianjin River West Real Estate Development Co., Ltd. is a limited company based in Tianjin, China.

2. Defendant Cole Matthew Harris (“Harris”) is a resident of San Marino, Los Angeles County, California.

3. Defendant Ying Chen aka Cindy Chen ("Chen") is a resident of San Marino, Los Angeles County, California.

**VENUE**

4. Venue is proper in this Court pursuant to section 395(a) of the Code of Civil Procedure because Defendants reside in Los Angeles County, California.

**INTRODUCTION**

5. River West is a real estate development company based in Tianjin, China.

6. Harris and Chen held themselves out as a married couple who purported to be successful business owners and investors from the United States. They approached River West because they purportedly had substantial capital they would like to invest in China, including through a Chinese company they founded and controlled called Tianjin Jialei Real Estate Development Co., Ltd. ("Jialei").

7. River West and Jialei entered into a joint venture agreement and later a cooperative loan agreement to jointly grow their business in real estate development.

8. Under the cooperative loan agreement, the companies agreed to be jointly responsible for loan repayments on a ¥140 million Yuan loan River West took out in its own name but for the benefit of both companies. Jialei received ¥80 million Yuan of the loan proceeds in 2013 and was responsible for payments on this portion of the loan.

9. In or around 2016, it became clear that Jialei was not able to hold up its end of the bargain. Jialei stopped paying its share of the loan payments. Meanwhile, River West continued to make all loan payments, including Jialei's share, to the bank.

10. River West sued Jialei in China for breach of the cooperative loan agreement to seek reimbursement of Jialei's share of the loan payments and prevailed. In or around August 2020, during an execution proceeding, River West discovered that Jialei transferred at least ¥30 million

Yuan to Chen's personal account between 2014 and 2016, essentially draining Jialei's bank account and caused Jialei to default on its obligations in 2016. Upon information and belief, Chen then transferred these funds to the United States to fund her and Harris's lavish lifestyle as well as Harris's failed political campaign for Lieutenant Governor of California in 2018.

11. Had River West been made aware that Jialei planned to divert company funds for Defendants' personal use, it would not have entered into any joint venture or cooperative loan agreement with Jialei. Because of Jialei's false representations and failure to disclose, River West has suffered at least ¥57,978,599.13 Yuan (or approximately $8,110,597.24) in damages.

12. River West now brings this lawsuit to hold Harris and Chen responsible for their wrongful conduct, aiding and abetting Jialei's wrongful conduct, civil conspiracy, and unjust enrichment.

**FACTUAL ALLEGATIONS**

13. Through a mutual business contact who is a relative of Chen's, River West was introduced to Harris and Chen, who held themselves out as a married couple. Upon information and belief, Harris and Chen represented to River West that they were successful business owners and investors in the United States, owning considerable businesses and assets including several hospitals. Upon information and belief, Harris and Chen further represented that they had a substantial amount of capital that they would like to invest in China, including through their company Jialei.

14. Upon information and belief, Harris was Jialei's legal representative, executive director, and general manager until January 16, 2018, shortly before the launch of his political campaign in California. Upon information and belief, after January 16, 2018, Harris became a director of Jialei and Chen's father, Changchun Chen (then 75 years old), became Jialei's legal representative instead.

15. In or around 2006, River West and Jialei entered into a joint venture agreement to

jointly develop an education center. In or around 2012, the development project was complete and overall successful.

16. As their business partnership grew, in or around 2013, River West and Jialei entered into a cooperative loan agreement. Under the agreement, the two companies agreed that River West would borrow ¥140 million Yuan from China Merchant Bank and would split the proceeds of the loan as follows: River West would receive ¥60 million Yuan (or 42.86%) and Jialei would receive ¥80 million Yuan (or 57.14%) and the companies would use the proceeds on their future joint venture projects and other legitimate business purposes. The companies also agreed to be jointly responsible for repayment of the loan's principal, interest, and other expenses based on the agreed-upon split.

17. After the cooperative loan agreement was executed, River West borrowed ¥140 million Yuan from China Merchant Bank.

18. After River West received the loan proceeds from China Merchant Bank, it promptly transferred ¥80 million Yuan to Jialei in accordance with the cooperative loan agreement.

19. Beginning on or around January 1, 2016, Jialei stopped making its share of the loan payments under the cooperative loan agreement. Meanwhile, River West continued to make timely and full loan payments to China Merchant Bank for both companies. River West made numerous demands on Jialei for contribution of these loan payments to no avail. Left with no other choice, River West sued Jialei for breach of the cooperative loan agreement in Tianjin, China.

**A. River West's First Lawsuit Against Jialei in 2016**

20. In or around October 2016, River West sued Jialei at the Tianjin Second Intermediate People's Court for breach of the cooperative agreement. Jialei appeared and defended itself. After a trial, the court issued a judgment in River West's favor for approximately ¥9,274,010 Yuan plus legal interest (Judgment No. (2016) Tianjin 02 Civil 801). This decision was affirmed on appeal. And the judgment was fully enforced against Jialei's assets in 2018.

21. In this lawsuit, River West also asked the court to terminate the cooperative loan agreement so that River West would no longer be responsible for Jialei's share of loan payments. But the trial court denied that request and the appellate court affirmed.

**B. River West's Second Lawsuit Against Jialei in 2019**

22. Because the court refused to terminate the cooperative loan agreement, River West continued to make full loan payments on behalf of both companies to China Merchant Bank. In 2019, River West brought a second lawsuit against Jialei to recover loan payments River West made on Jialei's behalf from Q3 2017 to Q4 2018 pursuant to the cooperative loan agreement. Jialei did not appear. The court entered a judgment in River West's favor for approximately ¥16,102,575.11 Yuan plus legal interest ((Judgment No. (2019) Tianjin 0103 Civil 3643)). Through an execution proceeding conducted by the court, River West collected approximately ¥851,688.32 Yuan against Jialei's assets but was unable to collect the remainder because the court found that Jialei had no other collectible assets.

**C. River West's Third Lawsuit Against Jialei in 2020**

23. As the cooperative loan agreement was still in effect, River West continued to make full loan payments on behalf of both companies to China Merchant Bank. In 2020, River West brought a third lawsuit against Jialei to recover loan payments River West made on Jialei's behalf from January 2019 to May 20, 2020 pursuant to the cooperative loan agreement and to terminate the cooperative loan agreement. Jialei did not appear. The court entered a judgment in River West's favor for approximately ¥25,615,708.37 Yuan plus legal interest (Judgment No. (2020) Tianjin 0103 Civil 5915) and terminated the cooperative loan agreement. In an execution proceeding through the court, River West was unable to collect any portion of this judgment because the court found that Jialei had no collectible assets.

**D. Discovery of Significant Transfers from Jialei to Chen**

24. In connection with the execution of the 2019 judgment from the second lawsuit,

River West applied for an investigation order, similar to a subpoena, from the court in 2020 to examine Jialei's assets (Execution Case No. 2019 Tianjin 0103 Execution 7879). In the court-ordered investigation, River West obtained Jialei's bank statements in August 2020. The bank statements showed that Jialei transferred ¥35,128,678.94 Yuan to Chen's personal account between March 2014 and May 2016. Chen also transferred ¥4,710,000 back to Jialei around this time period. Overall, Jialei transferred at least a net of ¥30,418,678.94 Yuan to Chen. Upon information and belief, Chen and Jialei did not use the ¥30,418,678.94 Yuan for River West and Jialei's joint venture project(s) or any other legitimate business purposes.

25. Upon information and belief, Harris and Chen treated Jialei's bank account as their personal piggy bank and transferred substantial company funds from Jialei for their personal use.

26. In addition, Jialei's bank statements also revealed transfers described as "loans" to at least eleven other individuals and entities for a net total of ¥42,469,828.9 Yuan between July 2013 to June 2017.

27. Upon information and belief, Jialei transferred the vast majority of the ¥80 million Yuan loan proceeds either to Chen's personal accounts or as "loans" to other individuals and entities, instead of on any joint venture projects with River West or any other legitimate business purpose for a real estate development company. Upon information and belief, in China, a company registered as a real estate development company, such as Jialei, is not permitted to engage in the business of making loans.

**E. Harris and Chen Absconded with Jialei's Funds**

28. Almost immediately after Harris left his role as the legal representative, executive director and general manager at Jialei in January 2018, He became a candidate in an unsuccessful bid for Lieutenant Governor of California but lost in the June 2018 primary. The Los Angeles Times reported that "Harris put $2.2 million of his own money into his first campaign for statewide office." *See* LOS ANGELES TIMES, *Wealthy GOP candidate for California lieutenant governor is*

*sued by his campaign advisors* (Nov. 27, 2018), available at https://www.latimes.com/politics/la-pol-ca-cole-harris-campaign-lawsuit-20181127-story.html. This Los Angeles Times Article is attached as **Exhibit A**. According to the Los Angeles Times, a lawsuit filed by a campaign consultant against Harris and Chen (a copy of the First Amended Complaint from this lawsuit is attached as **Exhibit B**) alleged that "Harris told his campaign consultant that he was prepared to put up $10 million or more for the campaign." *Id.* The lawsuit also alleged that "Harris boasted about the $10,000 Hermes belt he had recently acquired, and other expensive items he owned, such as his Lamborghini and private aircraft" and that "he could raise $100 million from friends and business associates." *Id.* The Los Angeles Times also reported that "Harris' most recent campaign finance filing with the state indicates his campaign ended in June with $1.1 million in outstanding debts and $38,000 in the bank after spending $3.5 million on the race." *Id.*

29. Upon information and belief, Harris and Chen continued to perpetrate other fraudulent schemes in California.

30. Most recently, Harris and Chen are named as criminal defendants for fraudulently obtaining over $3,755,122 in PPP loans (forgivable loans the federal government issued to small businesses during COVID for keeping their employees) on behalf of two shell companies without active business operations in *United States v. Harris et al.*, Case No. 2:23-cr-00095 (C.D. Cal.). A copy of the criminal complaint is attached as **Exhibit C**.

31. In addition, a recent civil lawsuit filed in this Court alleges that Harris and Chen fraudulently took title of an $8 million property in San Marino that belonged to a business acquaintance by filing a fraudulent statement of information with the California Secretary of State naming Chen as the CEO of an LLC that owned the property and then selling the property without the owner's knowledge or consent. *See He v. Chen et al.*, Case No. 23AHCV00325 (Los Angeles Sup. Ct.). A copy of the First Amended Complaint is attached as **Exhibit D**.

32. Upon information and belief, having transferred substantial funds from Jialei, Harris and Chen absconded with Jialei's funds. Upon information and belief, Harris and Chen transferred the funds ultimately to accounts under their control in the United States, among other things, to fund their luxurious lifestyle and Harris' unsuccessful political campaign.

**F. Harris and Chen Are Jialei's Alter Egos and Co-Conspirators**

33. Upon information and belief, at all relevant times, Defendants and Jialei acted as an agent, co-conspirator, alter ego and/or joint venture to each other and acted within the scope of such agency, alter ego, and/or in furtherance of the conspiracy and/or joint venture with each other's full knowledge, consent, permission, authorization, and ratification.

34. Upon information and belief, there existed and exist a unity of interest and ownership between Defendants and Jialei such that any separateness between them has ceased to exist. Defendants completely controlled, dominated, managed, and operated Jialei.

35. Upon information and belief, at all relevant times, Defendants, among other things, (1) controlled the business and affairs of Jialei; (2) commingled the funds and assets of Jialei and diverted company funds and assets to their own personal use; (3) disregarded legal formalities and failed to maintain arm's length relationship with Jialei; (4) inadequately capitalized Jialei; and (5) used Jialei as a mere shell, instrumentality, or conduit for themselves.

**FIRST CAUSE OF ACTION**

**Fraud (against both Defendants)**

36. Plaintiff hereby re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

37. Upon information and belief, Defendants and Jialei made representations to River West about Defendants' background as allegedly successful business owners and investors from the United States with substantial capital to invest in China. Upon information and belief, Defendants and Jialei made representations to River West about the intended purpose of the loan

proceeds under the cooperative agreement, including that the loan proceeds would be used on the companies' future joint venture project(s) and other legitimate business purposes. Upon information and belief, these representations were false. Upon information and belief, when Defendants made these representations, they knew these the representations were false or they made the representations recklessly and without regard for their truth. Upon information and belief, Defendants intended River West to rely on the representations.

38. Upon information and belief, Defendants and Jialei intentionally failed to disclose to River West that Jialei functioned as the Defendants' personal piggy bank. Upon information and belief, Defendants and Jialei further intentionally failed to disclose to River West that Jialei intended to transfer and did transfer substantial company funds for Defendants' personal use when those funds could have and should have been used to pay Jialei's share of the loan payments under the cooperative loan agreement.

39. River West reasonably relied on Defendants' and Jialei's representations.

40. River West did not know of the concealed facts.

41. Upon information and belief, Defendants and Jialei intended to deceive River West by concealing the facts.

42. River West was harmed.

43. River West's reliance on Defendants' and Jialei's misrepresentations were a substantial factor in causing River West the harm.

44. Defendants' and Jialei's concealment was a substantial factor in causing River West the harm.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Fraud (against both Defendants)

45. Plaintiff hereby re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

46. Upon information and belief, Defendants had actual knowledge of the fraud Jialei perpetrated on River West and provided substantial assistance.

47. Defendants' conduct was a substantial factor in causing harm to River West.

**THIRD CAUSE OF ACTION**

**Breach of Fiduciary Duty (against both Defendants)**

48. Plaintiff hereby re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

49. As a co-venturer, Jialei owed a fiduciary duty to River West.

50. Upon information and belief, Jialei breached its fiduciary duty by, among other things, failing to disclose material information to River West, such as that Jialei functioned as the Defendants' personal piggy bank and that Jialei intended to transfer and did transfer substantial company funds for Defendants' personal use when those funds could have and should have been used to pay Jialei's share of the loan payments under the cooperative loan agreement.

51. River West was harmed.

52. Jialei's conduct was a substantial factor in causing River West's harm.

53. As Jialei's alter egos, Defendants are liable for Jialei's breach of fiduciary duty to River West.

**FOURTH CAUSE OF ACTION**

**Aiding and Abetting Breach of Fiduciary Duty (against both Defendants)**

54. Plaintiff hereby re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

55. Upon information and belief, Defendants had actual knowledge of Jialei's breach of fiduciary duty to River West and provided substantial assistance.

56. Defendants' conduct was a substantial factor in causing harm to River West.

**FIFTH CAUSE OF ACTION**

**Civil Conspiracy (against both Defendants)**

57. Plaintiff hereby re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

58. Upon information and belief, Defendants were aware that Jialei planned to defraud River West and/or breach its fiduciary duty to River West.

59. Defendants agreed with Jialei and intended that River West be defrauded and the fiduciary duty be breached.

60. River West was harmed.

**SIXTH CAUSE OF ACTION**

**Unjust Enrichment (against both Defendants)**

61. Plaintiff hereby re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

62. Defendants received substantial funds from Jialei. Defendants' unjust retention of the funds was at the expense of River West.

63. River West was harmed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Tianjin River West Real Estate Development Co., Ltd. respectfully requests that this Honorable Court enter judgment in its favor and order the following relief:

1. For compensatory and consequential damages in an amount according to proof but in no event less than ¥57,978,599.13 Yuan (or approximately $8,110,597.24);
2. For punitive and exemplary damages according to proof;
3. For any and all recoverable costs, including attorney's fees;
4. For legal interest;
5. Such other and further relief as this Court deems just and proper.

Dated: July 31, 2023

Respectfully submitted,

The Morrow Firm, P.C.

By: /s/ Xinlin Li Morrow
Xinlin Li Morrow

*Attorney for Plaintiff Tianjin River West Real Estate Development Co., Ltd.*

# Exhibit A

Los Angeles Times

POLITICS

# Wealthy GOP candidate for California lieutenant governor is sued by his campaign advisors

BY PATRICK MCGREEVY

NOV. 27, 2018 12:05 AM PT

Reporting from Sacramento — A wealthy Republican businessman from San Marino who finished third in the California lieutenant governor's race during the June primary is in a legal and financial dispute with a campaign consultant after his failure to make the general election.

Cole Harris, who received attention for social media posts showing him posing on a yacht, in front of a private jet and with exotic cars and expensive French wine, received 17.5% of the vote in the 12-person June 5 primary. He was sued last month in Los Angeles County Superior Court by a Florida-based political consulting company, Majority Strategies, which alleges breach of contract and fraud by Harris and his campaign. The lawsuit accuses Cole of failing to pay $420,000.

"Harris consistently and deliberately misrepresented his ability to raise and provide Majority Strategies with the necessary funds to run a campaign that would result in success in the California Lt. Governor primary and Harris' goal of increased name identification statewide," the lawsuit says.

Harris, the CEO of a private investment firm, said he has retained an attorney to fight the lawsuit.

"At the end of the day, they made promises that they didn't keep," Harris said of the campaign consultant firm. "It's not a matter of me not wanting to pay them. It's just a

matter of I'm standing up for integrity."

Harris put $2.2 million of his own money into his first campaign for statewide office. But the lawsuit alleges Harris told his campaign consultant that he was prepared to put up $10 million or more for the campaign before he scaled it back, leaving the effort "severely undercapitalized."

"In an attempt to demonstrate his wealth, Harris boasted about the $10,000 Hermes belt he had recently acquired, and other expensive items he owned, such as his Lamborghini and private aircraft," the lawsuit says, adding that he assured the consulting firm he could raise $100 million from friends and business associates.

The lawsuit seeks to hold Harris personally liable for the financial obligation, though his attorney has argued the candidate cannot be sued for the campaign's debts.

"Mr. Harris should never have been named as a defendant in this lawsuit," said Reed Aljian, his attorney. "The claims against him are baseless. We look forward to litigating these issues, and we anticipate he will be discharged from the lawsuit in due course."

Harris received the endorsement of the California Republican Party but placed third behind two Democrats on June 5. Primary rules allow the top two vote-getters to advance to the November general election.

Democrat Eleni Kounalakis, a former U.S. ambassador to Hungary, was elected Nov. 6 as the next lieutenant governor, a job with few duties that pays $146,854 annually but is seen as a potential stepping stone to being governor. She and her father, a Sacramento real estate developer, provided almost $13 million to her campaign.

The lieutenant governor serves as a University of California regent, a trustee of the California State University, a member of the State Lands Commission and as chair of the

state Commission for Economic Development. The person holding the post also serves as acting governor when the actual governor is out of the state.

Harris' most recent campaign finance filing with the state indicates his campaign ended in June with $1.1 million in outstanding debts and $38,000 in the bank after spending $3.5 million on the race.

The lawsuit says Majority Strategies senior national strategist Chris Faulkner was senior advisor to the Harris campaign and that part of the goal was to increase name recognition so Harris could run for office again in the future.

In September, an unknown person changed Harris' campaign website to post, "Cole Harris owes his campaign vendors and employees at least $1.1 million dollars in unpaid bills," according to nonprofit news organization CALmatters. The website has since been taken down, as were Instagram photos of him posing with a Rolls-Royce and other exotic cars.

Despite the legal battle, Harris indicated California voters may not have seen the last of him.

"I am keeping my options open," Harris told The Times. "I'm still seeing how the lay of the land is, but I am very interested in still running."

**Coverage of California politics »**

***patrick.mcgreevy@latimes.com***

***Twitter: @mcgreevy99***



Patrick McGreevy

Patrick McGreevy covered the California Legislature out of the Sacramento bureau until 2021. He joined the Los Angeles Times in 1998 and worked in the City Hall and San Fernando Valley bureaus, writing about subjects including Valley secession, LAPD reform and city government during the administrations of Mayors Richard Riordan, James Hahn and Antonio Villaraigosa. He is a native of San Diego and a graduate of San Jose State University.

Copyright © 2023, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

# <u>Exhibit B</u>

HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
KRISTA L. BAUGHMAN (SBN: 264600)
kbaughman@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

Attorneys for Plaintiff
Majority Strategies, LLC

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES – UNLIMITED JURISDICTION**

MAJORITY STRATEGIES, LLC, a Florida limited liability company,

Plaintiff,

vs.

COLE HARRIS, an individual; COLE HARRIS FOR LT. GOVERNOR 2018, INC., a California nonprofit mutual benefit corporation; and CINDY CHEN, an individual,

Defendants.

Case Number: BC723899

**FIRST AMENDED COMPLAINT FOR:**

(1) Breach of Contract
(2) Fraud
(3) Quantum Meruit
(4) Account Stated
(5) Unfair Business Practices, Cal. Bus. & Prof. Code §§ 17200 *et seq*.

JURY TRIAL DEMANDED

Plaintiff Majority Strategies, LLC ("Majority Strategies"), by and through its attorneys, Dhillon Law Group, Inc., files this First Amended Complaint against Cole Harris ("Harris"), his campaign entity, Cole Harris for Lt. Governor 2018, Inc. ("Campaign"), and his partner, Cindy Chen ("Chen"), (Harris, the Campaign, and Chen are collectively referred herein as "Defendants"), and alleges as follows:

**INTRODUCTION**

1. Plaintiff Majority Strategies is a national influence marketing services firm hired by the Defendants to manage Harris's 11th-hour decision to run for Lieutenant Governor ("Lt. Governor") of California in the 2018 election. Harris and his partner Chen represented to Majority Strategies that Harris was willing to contribute about ten million dollars of his personal wealth into his campaign. These statements and representations were false (Harris never contributed more than $2.2 million dollars to his campaign), and upon information and belief, were intended to induce Majority Strategies to work with the Defendants.

2. The Campaign was severely undercapitalized, which resulted in the Campaign's inability to pay outstanding invoices to Majority Strategies. Yet, Defendants continued to make false representations to Majority Strategies and other vendors – assuring them that Harris would "infuse" and "inject" money into the Campaign, either personally or through third parties – in order to induce Majority Strategies to continue work without payment for its outstanding invoices. These statements were deliberately made by the Defendants, despite their lack of intention to pay for the services rendered.

3. After Defendants narrowly failed to qualify for the general election, Defendants continued to refuse to pay the outstanding invoices from Majority Strategies, thereby breaching contractual and other promises they made to Majority Strategies. Defendants personally benefited from Majority Strategies' services, which boosted Harris's name identification for a future political campaign or other business enterprises. Defendants knowingly and deliberately lied to Majority Strategies about their ability and intention to pay for all services rendered, causing over $400,000 of harm to Majority Strategies.

//

## PARTIES

4. Plaintiff Majority Strategies is a Florida limited liability company with its principal place of business in Jacksonville, Florida. Majority Strategies is duly authorized to transact business within the State of California.

5. Defendant Harris is an individual who, upon information and belief, currently resides in Los Angeles County, California.

6. Defendant Campaign is a California nonprofit mutual benefit corporation, which according to its filings with the California Secretary of State, has its principal place of business in Los Angeles County, California. Harris serves as the Campaign's Chief Executive Officer.

7. Defendant Chen is an individual who, upon information and belief, currently resides in Los Angeles County, California. Chen and Harris publicly represent themselves to be a married couple; however, on information and belief, Chen and Harris are not legally married.

8. In or around February, 2018, Harris and Chen formed a conspiracy to carry out their fraud upon Majority Strategies. Acting in concert, and in furtherance of this conspiracy, Harris and Chen created a separate campaign entity, the Campaign, which then became a co-conspirator. Defendants fraudulently promised others, including Majority Strategies, that Harris (with the financial backing of his wealthy partner, Chen) would personally pay for any debt incurred by the Campaign. Harris and Chen routinely displayed their wealth to Majority Strategies, including by flashing their several-thousand-dollar watches, designer clothing, high-end cars, and multi-million-dollar home. As a result of these displays, and Defendants' representations that Harris would *personally* ensure payment for all services rendered in connection with the Campaign, Majority Strategies was induced to provide services in furtherance of Harris's campaign for Lt. Governor, for which services Defendants now refuse to pay. As a result of their conspiracy, Majority Strategies was harmed, and Defendants, co-conspirators in causing that harm, are jointly and severally liable.

9. As set forth in detail below, Harris is liable for his breaches of contract, fraud, and related wrongful conduct. In addition, and in the alternative, Harris is also personally responsible for the debts, obligations, and liabilities of the Campaign because he is an alter ego of the Campaign, including by reason of the following: the Campaign was and is undercapitalized and cannot pay



DHILLON LAW GROUP INC.

Majority Strategies (or other vendors) monies owed; Harris, the Campaign's Chief Executive Officer, is one of only two directors in the Campaign; Harris was the major source of funds for the Campaign; the Campaign was created for the sole purpose of advancing Harris's campaign for Lt. Governor of California; corporate formalities were disregarded; Harris frequently represented to third parties, including Majority Strategies, that he would personally satisfy the Campaign's financial obligations; Harris commingled assets with the Campaign; and Defendants intended to use the corporate entity as a shield against personal liability. Adherence to corporate form would also sanction Defendants' fraud and lead to the inequitable result whereby the Campaign, which is currently unable or unwilling to satisfy its financial obligations, cannot satisfy any judgment entered against it. Accordingly, both Harris and the Campaign should be held liable for the debts of the other.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to the California Constitution, Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other courts."

11. This Court has jurisdiction over all Defendants because each Defendant is either a citizen of California, has sufficient minimum contacts in California, and/or otherwise intentionally avails himself and itself of the California market so as to render the exercise of jurisdiction over it or him by the California courts consistent with traditional notions of fair play and substantial justice.

12. Venue is proper in this Court, because Harris and Chen reside in Los Angeles County, and/or the Campaign has its principal place of business in Los Angeles County. (Code Civ. Proc., § 395(a).)

## GENERAL ALLEGATIONS

13. Plaintiff Majority Strategies is a premier national influence marketing services firm, with over two decades of experience across elections, advocacy, and brand. Majority Strategies' experience and qualifications are well respected in the political realm, as the company is well known for running successful campaigns for a number of elections, ranging from local elections to elections for the U.S. House of Representatives and the U.S. Senate. Majority Strategies' clients regularly praise the company for its unmatched ability to deliver high quality work within the client's budget, to

motivate and persuade voters to exercise their right to vote, and to manage clients' short-term and long-term goals.

14. On or about February 21, 2018, Majority Strategies' Chief Executive Officer, Brett Buerck ("Buerck"), and its Senior National Strategist, Chris Faulkner ("Faulkner"), met with Harris and Chen at Harris and Chen's multi-million-dollar residence in San Marino, California to discuss Harris's potential campaign. Since the filing of the initial complaint in this action, Majority Strategies has learned that the title to Harris and Chen's residence is held by a trust, which, on information and belief, Defendants arranged so as to avoid enforcement of any judgment against them. At this meeting, Harris stated, "We will spend what it takes to win. I can put ten to twenty million dollars for the primary and then another fifty million for the general election," or words to similar effect. In an attempt to demonstrate his wealth, Harris boasted about the $10,000 Hermès belt he had recently acquired, and other expensive items he owned, such as his Lamborghini and private aircraft. Harris also assured Buerck and Faulkner that he could easily raise a hundred million dollars from his friends and work associates.

15. Upon information and belief, Harris made these statements to induce Majority Strategies to work with Harris on his campaign.

16. Chen, Harris's wealthy partner, had control over most, if not every, major financial decision made in connection with Harris's campaign. Indeed, Harris stated to Faulkner (and two others present at the time) that Chen must be present at all weekly budget meetings for the campaign. As such, Chen was present at the February 21, 2018 meeting, as well as every other meeting involving Harris and Majority Strategies that concerned any major financial decision made with respect to Harris's campaign.

17. Indeed, at one point during the campaign, Faulkner witnessed a heated argument between Harris and Chen that, from Faulkner's understanding of what was said by Chen and Harris, arose because Harris withdrew $200,000 from an account without Chen's consent. As result of these and other representations made by Defendants, Majority Strategies understood that Chen's permission was needed with respect to every significant financial decision made in connection with the campaign, regardless of whether that decision involved Majority Strategies.



DHILLON LAW GROUP INC.

18. One week after the initial meeting, on February 28, 2018, Faulkner met with Harris and Chen once again. Harris reiterated his desire to run for Lt. Governor, and confirmed that he understood that he would need to spend about ten million dollars to have a viable chance at qualifying for the run-off election. Harris and Chen assured Faulkner that financing the campaign would not be an issue, and that Harris would put his own personal wealth into the Campaign. For example, when Faulkner stressed the significant amount of funding Harris's statewide campaign would require (i.e. several million dollars of Harris's personal funds), Chen repeatedly stated to Faulkner "it's not a problem" and waved her hand dismissively.

19. Faulkner returned to Harris's residence on March 2, 2018. At this point, Harris began to strategize with Faulkner about his campaign. Harris told Faulkner that he wanted to decrease TV spending, so he could spend six million dollars in digital ads. To demonstrate his commitment, Harris stated that he had put in the "first million already to kick this off," or words to similar effect. This is but one example of Harris treating his own funds as the campaign's funds, and representing the same to Majority Strategies.

20. Throughout the campaign, Chen also repeatedly expressed her desire for a reduction of TV ad spending, and that those funds instead be devoted to digital ads. Faulkner strongly advised against that approach, and advocated for a more comprehensive advertisement strategy, rather than to be overly reliant on digital ads. After Chen began to see herself appear on TV ads, in connection with her partner's campaign, her resistance to Faulkner's strategy waned.

21. On March 13, 2018, Harris, and behalf of himself and/or the Campaign, signed a written contract ("Agreement") between, on the one hand, Harris and the Campaign and, on the other hand, Majority Strategies. A true and correct copy of the Agreement is attached to this First Amended Complaint as **Exhibit A**.

22. The Agreement provided that Faulkner would act as Senior Advisor to Harris and the Campaign. Faulkner was authorized by Harris and/or the Campaign "to authorize payments, expenditures and advertising for every aspect of the campaign."

23. Moreover, the Agreement states that the Harris and/or the Campaign agree to pay for Majority Strategies' services within 15 days of issuance of an invoice. In Addendum A, Harris and the

Campaign also agreed to pay a Management Fee of $25,000 to Majority Strategies on the first of each month for the Senior Advisor's services on the campaign. Section (g) states, "[i]f any of these Management Fees not be provided as outlined, that shall result in a breach of contract by the [Campaign]."

24. The Agreement also provided that its terms shall "be governed by the laws of the State of California."

25. On the same day the Agreement was signed, March 13, 2018, Harris and Chen's agents formally established the Campaign as a non-profit and registered it with the California Secretary of State.

26. Faulkner worked closely with Harris as the Senior Advisor to the campaign. Faulkner's responsibilities included working in all areas of campaign strategy, day-to-day operations, and communications. In order to pay employees, vendors, and venues for campaign events, Faulkner told Harris that he would either need to fundraise quickly, or inject more of his (or Chen's) promised personal money into the campaign.

27. On or about March 16, 2018, Harris informed Faulkner that Harris could deposit a million dollars in the Campaign's account by the following Monday. Harris stated that he "just [had] to move some money around," or words to similar effect, implying that he was transferring his personal funds from a personal account into the bank account for the Campaign, including for the purpose of satisfying Majority Strategies' invoices. Chen was present during the exchange but concealed the fact (unknown to Majority Strategies at the time) that Harris would likely not be funding the Campaign with solely his own money, but with Chen's.

28. Over the next few weeks, Faulkner worked closely with Harris in order to broaden the campaign's exposure. On or about March 29, 2018, Harris began to decrease his initial ten million dollar budget, so that he would "only have to put in six million," or words to similar effect, yet again representing that he viewed his funds and the Campaign's to be fungible and interchangeable.

29. Upon information and belief, Harris consistently and deliberately misrepresented his ability to raise and provide Majority Strategies with the necessary funds to run a campaign that would result in success in the California Lt. Governor primary and Harris's goal of increased name

identification statewide.

30. Just three weeks into the parties' relationship, on April 4, 2018, Harris informed Majority Strategies that he had received a notice from Wells Fargo that his attempted deposit of two $500,000 checks had been returned as unpaid, and that Wells Fargo had deducted $1,400,000 from the Campaign account. Harris e-mailed Faulkner and other Campaign vendors/workers that "[t]he money is there in my Chase account. So THERE IS DEFINITELY AN ISSUE AT WELLS !!!!!!!!!!!!!!!!!" Again, Harris portrayed his and Chen's personal funds as interchangeable with the Campaign's, and represented that Harris had substantial funds in his bank account, and assured campaign vendors that he would personally satisfy Campaign debts.

31. As of April 4, 2018, Harris and/or the Campaign were in breach of the contract with Majority Strategies. Per the Agreement, $25,000 was due on or before April 1, for services rendered in March. Due to the Campaign's lack of funds, and Harris's failure to resolve these monetary issues, these amounts were not paid until April 11.

32. At this time, Harris and Chen did not allow Faulkner to exercise the contractual rights afforded to Faulkner by the Agreement to authorize all payments, expenditures, or advertising on behalf of the Campaign. Instead, Harris claimed a sudden lack of trust in "political people," and kept a separate staff that would authorize and pay invoices and expenditures.

33. Throughout the month of April, Harris would repeatedly tell Faulkner, other employees of Majority Strategies, and members of the California Republican Party that he was still prepared to spend millions of his own personal funds on his campaign.

34. On or about April 30, 2018, Harris told Faulkner that "After this convention, I will have my shit worked out with my business partners and can put in another two million to get us back up on TV and catch up on bills," or words to similar effect. In other words, Harris expressed to Majority Strategies that he would transfer two million dollars of his personal funds (now understood as likely being Chen's personal funds) into the Campaign for the purpose of satisfying the Campaign's debt to Majority Strategies, and others.

35. Upon information and belief, on or about May 1, 2018, Harris and the Campaign had amassed a number of unpaid invoices from vendors and individuals who had worked on the campaign.

As of this date, Defendants had failed to pay the last three invoices from Majority Strategies, and yet this did not deter Defendants from continuing to induce Majority Strategies to perform services for Harris's campaign. Indeed, Defendants continued to falsely represent that they would soon come current on all amounts payable to Majority Strategies, while having no intention to do so.

36. On or about May 4, 2018, Harris told Faulkner that he would be withdrawing money from his personal Chase bank account to deposit into the Campaign's account. This turned out to be false, as the General Ledger for the Campaign shows that no money was deposited on May 4, 2018.

37. On or about May 10, 2018, Faulkner made a verbal demand for payment to Harris for Majority Strategies' services. Harris said, "I know we got bills to pay. I am moving some money now and besides we are winning anyway," or words to similar effect.

38. On or around May 14, 2018, Harris stated to Faulkner that the president of Better 4 You Foods, LLC (a business owned and/or controlled by Harris) would "come by [Harris's] house with $200,000 in cash that [Harris] will deposit into the campaign account so we can get back up on TV," or words to similar affect.

39. Alarmed by this statement, and the possibility that Harris may be breaking federal or state campaign finance laws or regulations with a large cash contribution from a business, Faulkner asked for additional information regarding the source of the funds. Harris responded to Faulkner's request by stating "It's my fucking company and I can take out money when I want," or words to similar effect.

40. Faulkner then reminded Harris that he needed to maintain bank records in connection with all campaign donations, to which Harris responded "I got it covered," or words to similar effect. Majority Strategies is unaware of whether Harris ultimately made the $200,000 deposit to the Campaign's account or if he maintained documentation as to the same. On information and belief, this $200,000 is the same $200,000 that caused an argument between Harris and Chen as a result of Harris withdrawing the funds without prior approval from Chen. This suggests that Chen may also have a business interest in or control of Better 4 You Foods, LLC.

41. During Harris's campaign, Majority Strategies also learned from Harris that he reported approximately $120,000 as his gross income on his most recent tax return. Despite this

relatively modest income, Harris and/or Chen personally contributed over $2,000,000 to his campaign. On information and belief, some or all of the funds Harris claims to have contributed to the campaign personally were actually given to Harris by some other person (including Chen) or entity for the purpose of funding his campaign. By representing such funds as his personal contributions to the campaign, Harris intended to circumvent campaign finance laws and regulations, including limitations on campaign contribution amounts. Such regulations and laws include, but are not limited to, California Government Code §§ 85301-04, 85308, 18428, and 18545.

42. Despite Harris's repeated assertions that he would have "millions" of his own money to contribute to his campaign, as of May 17, 2018, Defendants' outstanding invoices totaled $502,343.12, of which $180,839.00 was owed to Majority Strategies.

43. On or about May 17, 2018, Faulkner made another verbal request for payment to Harris. At this time, Harris responded with promises of "catching up soon," and "getting paid from one of [Harris's] investments, and infusing it into the campaign" or words to similar effect.

44. Upon information and belief, at no point during his campaign did Harris have "ten million dollars of his own money" to contribute to his campaign. Upon information and belief, when Defendants learned the magnitude of costs required to run a successful statewide campaign in California, and realized that they did not have the funds to sustain the campaign, they deliberately provided Majority Strategies and other vendors with knowingly false assurances that the outstanding invoices would be paid, in an attempt to induce these vendors to continue to perform services for Defendants until at least the primary election on June 5, 2018, gambling either that they would survive the primary and make it into the general election race despite their lack of funds, or that the Harris would nonetheless benefit in terms of increased name identification in California for a future political race.

45. On or about May 24, 2018, Faulkner made another verbal demand for payment to Harris. Once again, Harris responded with promises of "catching up soon," or words to similar effect, and mentioned that he would infuse more of his personal wealth into the Campaign.

46. Shortly after the June primaries, it became apparent from the vote count that Harris would not be on the ballot for the upcoming November Lt. Governor general election. Elena

Kounalakis ("Kounalakis"), with 24.23% of the total vote, and Ed Hernandez ("Hernandez"), with 20.56% of the total vote, qualified for the November run-off election. Kounalakis had announced her campaign on April 24, 2017, while Hernandez had announced his campaign on or about February 2017 – well over a year before Harris entered the race.

47. Although Harris did not qualify for the November ballot, the value and success of Majority Strategies' work is evident in the fact that Harris emerged from the June primaries with 17.46% of the vote, by far the most successful Republican candidate on the ballot, despite having announced his campaign a mere three months before the primary.

48. Defendants have refused to pay any the outstanding invoices due and owing to Majority Strategies, totaling at this date $420,659.47, exclusive of interest. Upon information and belief, the amount of Harris's unpaid invoices to all of his and/or the Campaign's vendors total over $1,000,000. True and correct copies of Majority Strategies' outstanding invoices to Harris and the Campaign are attached hereto as **Exhibit B**.

49. Majority Strategies has made multiple requests, orally and in writing, that Harris and/or the Campaign satisfy the outstanding invoices. On June 22, 2018, Majority Strategies received an e-mail from Defendants stating, "With the election over, we are in the process of finalizing the accounts payable and preparing for the mandatory audit that the Political Reform Act requires. We are making sure all of the contracts are completed and that all other recordkeeping the law requires is in order. We thank you for your patience while we work through this, and we will be in touch as soon as we can with a more precise statement on your payment."

50. Despite being owed over $400,000 dollars, the only substantive communication that Majority Strategies has received from Defendants following Harris's loss in the primary election is a letter demanding control of the campaign website, despite Harris and/or the Campaign's being in breach of the Agreement. Majority Strategies is informed and believes that Defendants' insistence on regaining control of the campaign website, which they did not pay for, is for the specific purpose of running for office again in the future.

51. Defendants benefited from the services that Majority Strategies provided – including those services for which Defendants refuse to pay – during Harris's campaign for Lt. Governor.

Harris's intention to run for office again in the future is a quest for which his increased name recognition, as a direct result of Majority Strategies' work, will be critical. Harris's partner, Chen, stands to gain for the same reason—any subsequent political success would advance her own social standing and political connections.

**FIRST CAUSE OF ACTION**

**Breach of Contract**

**(Against Harris and the Campaign)**

52. Majority Strategies incorporates every allegation in the preceding paragraphs, as though set forth fully herein.

53. Majority Strategies entered into a valid contract with Harris and/or the Campaign, the Agreement, pursuant to which Harris and/or the Campaign were obligated to pay for consulting services. Majority Strategies understands that whether Harris, the Campaign, or both are parties the Agreement is a disputed factual issue, and accordingly it asserts breach of contract claims against both Harris and the Campaign. Additionally, as set forth herein, Majority Strategies alleges that Harris and the Campaign are alter egos, and that they are therefore liable for each other's debts under the Agreement, regardless of whether either or both are parties to the Agreement.

54. Majority Strategies performed all covenants, conditions, and promises required of it under the Agreement that were not excused or waived by Harris's and/or the Campaign's conduct.

55. Any covenants, conditions, and promises Majority Strategies was unable to perform were excused by the doctrine of impossibility, impracticability, and frustration of purpose.

56. Harris and/or the Campaign breached the Agreement by refusing to pay in full for the services provided by Majority Strategies, as alleged above.

57. Harris and the Campaign are responsible for all debts, obligations, and liabilities of each other because Harris and the Campaign are alter egos of one another, including because of one or more of the following reasons: Harris deliberately undercapitalized the Campaign; Harris was in complete control over the Campaign; Harris and the Campaign ignored the corporate form and comingled assets such that one should be liable for the debts of the other, and vice versa; and Harris was the major and primary source of funds for the Campaign. In addition, Harris and the Campaign

made many business deals knowing that the Defendants would not pay the invoices.

58. As a direct and proximate result of Harris's and/or the Campaign's breaches of contract, Majority Strategies has been damaged in a principal amount of $420,659.47, exclusive of interest.

**SECOND CAUSE OF ACTION**

**Fraud**

**Civ. Code, §§ 1572, 1573, 1710**

**(Against all Defendants)**

59. Majority Strategies incorporates every allegation in the preceding paragraphs, as though set forth fully herein.

60. Defendants formed a conspiracy to fraudulently induce Majority Strategies to provide consulting services in support of Harris's campaign for Lt. Governor, and to fraudulently induce Majority Strategies to continue providing those services even after Defendants failed to pay.

61. Defendants, and each of them, whether individually or through their co-conspirators, fraudulently misrepresented, by means affirmative misrepresentations and/or omissions, Harris's ability to contribute personal money to the Campaign, in an attempt to induce Majority Services—a premier consulting firm—to agree to take Harris and the Campaign on as clients.

62. When it became clear to the Defendants that they could not or would not pay the outstanding invoices and/or the full cost of running the campaign, Defendants, either themselves or through the actions of their co-conspirators, knowingly used false and misleading statements or omissions to induce Majority Strategies to continue to provide the consulting services discussed above, even after Defendants had no intention of paying for the services in full, if at all.

63. Defendants had a duty not to conceal that Harris could not, or would not, be able to personally fund the Campaign in the manner promised. Rather, Harris's "personal" funds were, on information and belief, supplied by Chen or other business entities under Harris's and/or Chen's control, such as Better 4 You Foods. Defendants actively concealed this information from Majority Strategies. Defendants also partially disclosed certain facts, namely that Chen's permission was needed for all major budgetary decisions, without conveying the additional material facts, namely that

Chen was the source of Harris's funds. Defendants also entered into a confidential and/or fiduciary relationship with Majority Strategies, by virtue of their entering into the business partnership with the goal of supporting Harris's campaign for Lt. Governor, and therefore had a duty to disclose the above-information, but failed to do so.

64. Majority Strategies reasonably and foreseeably relied upon Defendants' false and misleading statements, representations, and omissions concerning payment, as discussed above, in agreeing to provide its services and by continuing to perform those services for Defendants despite their failure to pay.

65. Majority Strategies has suffered damages as a direct result of its reasonable reliance on Defendants' false and misleading statements and omissions.

66. Defendants knew or should have known that their representations and omissions were false and misleading when they made them.

67. Defendants' false representations induced Majority Strategies to continue providing consulting services, in good faith that the payments were forthcoming.

68. The false representations and omissions made by Defendants, either themselves or through the acts of their co-conspirators, include, without limitations, the following:

a. False representations by Harris and Chen, on or around February 21, 2018, that Harris would be able and willing to contribute ten to twenty million dollars of his own funds to the campaign. Upon information and belief, Harris and/or Chen contributed no more than two million, two hundred thousand dollars of his personal funds to his campaign;

b. False representations by Harris and Chen, on or around February 28, 2018, that Harris would be able to contribute eight million dollars of his own funds to the campaign. Upon information and belief, Harris contributed no more than two million, two hundred thousand dollars of his personal funds to his campaign;

c. Chen, who, with full awareness of the above representations, and who participated in weekly budget meetings with Majority Strategies about the campaign, fraudulently concealed from Majority Strategies information that she, either entirely or in part, was the ultimate source of funds for Harris's campaign, and that Harris could not or would

not personally be able to contribute the promised funds to the Campaign;

d. False representations by Harris, in March and April 2018, that he would simply have to move some money around to solve his Campaign's cash flow issues and pay invoices;

e. False representation by Harris, on or around May 4, 2018, stating that Harris would visit Chase to transfer funds to the campaign that day, and that the funds were definitely in his Chase bank account;

f. False representation by Harris, on or around May 10, 2018, that Harris would pay shortly, and that Harris just needed additional time to "infuse" into the campaign, or words to similar effect.

g. False representation by Harris, on or around May 17, 2018, that Harris would pay shortly, and that Harris just needed additional time to "infuse" into the campaign, or words to similar effect.

h. False representation by Harris, on or around May 24, 2018, that Harris would pay shortly, and that Harris just needed additional time to "infuse" into the campaign, or words to similar effect.

i. False representations by Defendants that the Defendants would pay the unpaid invoices upon the completion of the campaign; and

j. False representation by the Defendants, on June 22, 2018, that the Defendants intended to pay all outstanding invoices.

69. As a direct and proximate result of Defendants' false misrepresentations, Majority Strategies has been damaged in the principal amount of $420,659.47, exclusive of interest.

70. As Defendants caused this harm in furtherance of their conspiracy to commit fraud against Majority Strategies, Defendants are jointly and severally liable for the same.

71. Additionally, as set forth above, Harris and the Campaign are alter egos, and each is therefore responsible for all debts, obligations, and liabilities of the other.

72. The actions of Defendants were intentional, willful, and malicious, and Majority Strategies is entitled to exemplary damages in an amount to be proven at trial, in order to deter Defendants and those like them from similarly defrauding service providers such as Majority

Strategies

**THIRD CAUSE OF ACTION**

**Quantum Meruit**

**(Against Harris and the Campaign)**

73. Majority Strategies incorporates every allegation in the preceding paragraphs, as though set forth fully herein.

74. In the alternative, if Harris and/or the Campaign should prove there was no valid and legally binding contract as to either or both of them, Majority Strategies is entitled to compensation pursuant to the theory of quantum meruit.

75. As described above, Majority Strategies provided valuable services and benefits to Harris and the Campaign in furtherance of Harris's campaign for Lt. Governor, which services were rendered at Defendants' request.

76. Defendants benefited from the services rendered by Majority Strategies. Harris, a Republican running for Lt. Governor in California, was a mere 3.1% away from qualifying on the ballot. The two Democratic candidates who had qualified had been actively campaigning for at least a year before Harris announced his belated campaign. Harris, a relatively obscure businessman prior to the campaign, had garnered over 48,551,329 impressions in the three months he began his campaign.

77. At all times relevant, Majority Strategies expected Harris and the Campaign to pay for the services rendered, and Harris and the Campaign understood that Majority Strategies expected to be compensated for those services when accepting the same.

78. Harris and the Campaign have failed to compensate Majority Strategies for the reasonable value of the services it provided.

79. As a result of Harris's and the Campaign's failure to compensate Majority Strategies for the reasonable value of its services, Harris and the Campaign have been unjustly enriched at Majority Strategies' expense, in an amount to be proven at trial but estimated at this time to exceed $420,659.47, exclusive of interest.

80. Additionally, as set forth above, Harris and the Campaign are alter egos, and each is therefore responsible for all debts, obligations, and liabilities of the other.

**FOURTH CAUSE OF ACTION**

**Account Stated**

**(Against Harris and the Campaign)**

81. Majority Strategies incorporates every allegation in the preceding paragraphs, as though set forth fully herein.

82. For the past four months, an account was stated by and between, on the one hand, Majority Strategies and, on the other hand, Harris and the Campaign, and each of them, wherein it was agreed that Harris and the Campaign, and each of them, are indebted to Majority Strategies in the sum of $420,659.47. (Ex. B.)

83. No part of said sum has been paid, although demand therefor has been made, and there is now due, owing and unpaid from Harris and the Campaign, and each of them, to Majority Strategies, the said amount.

**FIFTH CAUSE OF ACTION**

**Unfair Business Practices, Cal. Bus. & Prof. Code §§ 17200 *et seq.***

**(Against all Defendants)**

84. Majority Strategies incorporates every allegation in the preceding paragraphs, as though set forth fully herein.

85. Defendants' conduct, as alleged herein, including Defendants fraud on Majority Strategies and other vendors, as well as their conspiracy to commit the same, constitute unfair business practices in violation of California Business and Professions Code sections 17200 *et seq.*, including because these violations were done repeatedly, over a significant period of time, and in a systematic manner, to the detriment of Majority Strategies and the public.

86. Majority Strategies brings this cause of action seeking payment of the amounts Defendants acquired through the unlawful business practices described herein.

87. Defendants' knowing conduct, as alleged herein, constitute unlawful business practices set forth in California Business and Professions Code sections 17200-17208. Specifically, Defendants conducted business activities while failing to comply with the legal mandates cited herein, which include, but are not limited to, violating California's fraud statutes (Civ. Code, §§ 1572, 1573, 1710)

and campaign finance laws (Gov't. Code, §§ 85301-04, 85308, 18428, 18545).

88. As a result of Defendants' unfair business practices, Defendants have reaped unfair benefits at Majority Strategies' expense.

89. Majority Strategies is entitled to an injunction barring Defendants from repeating their unlawful conduct as described above.

90. Majority Strategies is entitled to the disgorgement of any profits or benefits that Defendants reaped or retained as a result of their unfair business practices described above.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Majority Strategies, LLC respectfully prays for relief and judgment against Defendants Harris, the Campaign, and Chen as follows, in amounts according to proof:

1. For judgment in favor of Plaintiff against Defendants;

2. For all damages legally and/or proximately caused to Majority Strategies by Defendants, in the amount of $420,659.47.

3. For exemplary and punitive damages;

4. For injunctive relief;

5. For pre-judgment and post-judgment interest;

6. For costs of suit incurred herein; and

7. For such other and further relief as the Court deems just and proper.

Date: March 7, 2019

DHILLON LAW GROUP INC.

By: ______________________________

Harmeet K. Dhillon
Krista L. Baughman
Gregory R. Michael
Attorneys for Plaintiff Majority Strategies, LLC

# EXHIBIT A

Cole Harris for Lt. Governor 2018 ("Customer or Campaign") has selected Majority Strategies, LLC and its subsidiaries (collectively as "Majority Strategies") to assist with the Campaign. Customer is electing to use Majority Strategies for influence marketing services and agrees to pay the corresponding amounts for these services as invoiced within 15 days, unless otherwise agreed upon.

1. All work will be done in a good and workmanlike manner in accordance with this contract and Majority Strategies shall be entitled to rely on instructions given by the following designee(s) for the customer: Cole Harris

2. Majority Strategies retains the sole responsibility over its staffing on this project and shall direct the manner in which the services are delivered as well as provide the necessary equipment, tools, materials, and supplies necessary to perform these services.

3. Majority Strategies represents to the Campaign that it is knowledgeable of the Campaign's potential compliance and legal obligations pursuant to the Federal Election Campaign Act of 1971, as amended ("FECA"), the Political Reform Act, and agrees to comply with all applicable laws in respect to the performance of the services under this agreement and to consult with the Campaign's legal counsel in the event Majority Strategies has questions regarding the application of any provision of law to Majority Strategies' services for the Campaign.

4. Absent any explicit written agreement to the contrary which has been executed between Majority Strategies and Campaign, signed by an authorized representative of Costumer, and appended hereto, Campaign retains and reserves the rights of exclusive ownership and use of any copy, product, publication, or any facsimile thereof which may result from Majority Strategies' creativity, except for pre-existing materials purchased by Majority Strategies for Campaign. Majority Strategies and Campaign agree that the work performed will be considered a "work for hire" for the purpose of the United States Copyright law, 17 U.S.C. § 101 et seq. and that, accordingly, Campaign is the owner of all copyright rights in the work. Majority Strategies hereby assigns any and all property and exclusive ownership rights in Majority Strategies work to Campaign.

5. Majority Strategies shall not be responsible for unavoidable delays beyond its control including, but not limited to, acts of terror, labor stoppages, strikes, fire or acts of God.

6. Majority Strategies shall be defended, indemnified and held harmless by the customer against any and all claims, losses, damages, expenses or judgments for any claimed acts of alleged libel, copyright infringements, plagiarism, invasion of privacy or civil rights or for any other claim which results from the items produced under to this contract. Likewise, Majority Strategies shall indemnify, hold harmless and defend the customer from any similar claims which arise out of unauthorized deletions, changes, or additions made by its staff to materials supplied by the customer.

7. It is understood that Majority Strategies is an independent contractor in the performance of this agreement and not an employee of the customer. Nothing contained herein shall be construed to imply an employment, joint venture or principal and agent relationship between the parties. Neither party shall have any right, power or authority to create any obligation, express or implied, on behalf of the other, other than as specified in paragraph 11 below.

8. Majority Strategies agrees to keep confidential all material and information therein received from Customer, including but not limited to supporter lists, mail files, polling information, email/phone number data or other such information provided by the Customer to Majority Strategies to assist with the campaign. Each party shall protect the other's Confidential Information from unauthorized dissemination and use the same degree of care that such party uses to protect its own like information. Neither party shall disclose to third parties the other's Confidential Information without the prior written consent of the other party. Neither party shall use the other's Confidential Information for purposes other than those necessary to directly further the purposes of this Agreement. Upon the termination or expiration of this agreement, Majority Strategies agrees to return to Customer and Campaign the Confidential Information, and all copies thereof, and to retain no copies thereof.

9. Majority Strategies will be the sole provider of direct mail, digital, and mobile advertising for the duration of the Customer's campaign.

10. Majority Strategies' employee, Chris Faulkner, shall serve in the role of Senior Advisor to the Customer's campaign and work in conjunction with the Customer and the General Consultant (Ryan Erwin) in all areas of campaign strategy, day-to-day operations and communications.

11.Chris Faulkner will have authority over the entire campaign and all its operations. Furthermore, Chris Faulkner will be empowered by the Customer and Campaign to authorize payments, expenditures and advertising for every aspect of the Campaign.

12. Majority Strategies agrees not to communicate, directly or indirectly, with any member of the news media on behalf of, for, or about Customer or Campaign, without the express advance consent of Costumer or Campaign.

13. Majority Strategies agrees that, during the course of this agreement and until the earlier of November 6, 2018, or the date of Cole Harris' public announcement of his withdrawal or the suspension of his campaign for statewide office, it will not perform services for any political committee, entity, or individual that opposes Cole Harris or supports any other California statewide candidate without the prior written consent of the Campaign.

14. This Agreement shall take effect under and be governed by the laws of the State of California.

**Addendum A**

15. Majority Strategies shall receive a Management Fee for its' services as Senior Advisor on the Campaign. The Mangement Fees due to Majority Strategies are as follows:

a. $25,000 due on March 1, 2018;

b. $25,000 due on or before April 1, 2018 for services performed in March;

c. $25,000 due on or before May 1, 2018 for services performed in April;

d. $25,000 due on or before June 1, 2018 for services performed in May; and

e. $25,000 due on or before July 1, 2018, for services perfomed in June;

f. For the avoidance of doubt, the total Management Fees due to Majority Strateigies for services performed through June 2018 shall be $125.000.

g. If any of these Management Fees not be provided as outlined, that shall result in a breach of contract by the Customer.

16. Should Cole Harris finish as one of the top two candidates in the California Statewide Direct Primary Election on June 5, 2018, the Customer shall provide a $75,000 bonus to Majority Strategies.

The parties hereto agree to all of the foregoing as of this date: 3/13/18

[signature]

Print: COLE HARRIS

[signature]

Print: Christopher Faulkner

**ADDENDUM B**

**INDEPENDENT CONTRACTOR CONFIDENTIALITY PLEDGE**

I, Chris Faulkner, affirm that during the term of my Agreement to provide services to Cole Harris for Lt. Governor 2018 ("Campaign" or "Customer"), I may become aware of or familiar with confidential or proprietary materials or information, and I agree that I shall not share such materials or information with any outside individuals whatsoever, including members of the media, unless granted explicit written permission by Campaign. "Confidential or proprietary materials or information" shall include but not be limited to donor lists, email lists, fundraising totals, fundraising goals, overall strategy, as well as all services performed or requested under this Independent Contractor Agreement.

I understand that all materials or information I view, read, examine or assemble during the term of my Agreement to provide services to Campaign, whether or not I participate in the construction of such materials or information, are and shall remain the intellectual property of Campaign. I understand that if I fail to abide by these policies, Campaign, and its directors and officers reserve the right to pursue any and all permissible avenues of legal action against me.

Signature: [signature] Date: 3.13.18

Name (print): Christopher Faulkner

# EXHIBIT B

**Majority Strategies, LLC**
12854 Kenan Drive, Suite 145
Jacksonville, FL 32258

# Invoice

MAJORITY STRATEGIES
ELECTIONS • ADVOCACY • BRAND

| BILL TO |
|---|
| Cole Harris<br>CA |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 2018-0870 | 04/19/2018 | $8,400.00 | 04/19/2018 | Due on receipt | |

**STRATEGIST**
Chris Faulkner

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Production & Delivery**<br>Harris_CA Collateral | 15,000 | 0.56 | 8,400.00 |

BALANCE DUE **$8,400.00**

Please ACH or Wire funds to:

Account #: 3111046169
Routing #: 111017979
Texas Capital Bank, N.A.
Dallas, TX

***PLEASE REFERENCE INVOICE NUMBER(S)***

Or send payment to our office via FedEx utilizing our account: 2135-4351-2

12854 Kenan Drive, Suite 145
Jacksonville, Florida 32258

**Majority Strategies, LLC**
12854 Kenan Drive, Suite 145
Jacksonville, FL 32258

# Invoice

MAJORITY STRATEGIES
ELECTIONS • ADVOCACY • BRAND

| BILL TO |
|---|
| Cole Harris<br>CA |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 2018-0886 | 04/20/2018 | $134,149.00 | 04/20/2018 | Due on receipt | |

**STRATEGIST**
Chris Faulkner

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Mobile**<br>Harris_CA_Mobile_FLT2 4/20-5/4 | 1 | 47,650.00 | 47,650.00 |
| **Web Advertising**<br>Harris_CA_Mobile_FLT2 4/20-5/4 Social Media | 1 | 134,525.00 | 134,525.00 |
| **Web Advertising**<br>Harris_CA_Mobile_FLT2 4/20-5/4 Display, Web & Search | 1 | 41,050.00 | 41,050.00 |
| **Content Creation**<br>Harris_CA_Digital - Unique Creatives for FB Twitter Insta Snap Chat | 6 | 279.1666667 | 1,675.00 |
| **Web design**<br>Harris_CA_Digital - Enhanced Website & Update Management | 1 | 5,749.00 | 5,749.00 |
| **Web design**<br>Harris_CA_Digital - Database Integration / Integrated DB Backbone | 1 | 3,500.00 | 3,500.00 |

| | |
|---|---|
| PAYMENT | 100,000.00 |
| BALANCE DUE | **$134,149.00** |

Please ACH or Wire funds to:

Account #: 3111046169
Routing #: 111017979
Texas Capital Bank, N.A.
Dallas, TX

***PLEASE REFERENCE INVOICE NUMBER(S)***

Or send payment to our office via FedEx utilizing our account: 2135-4351-2

12854 Kenan Drive, Suite 145
Jacksonville, Florida 32258

**Majority Strategies, LLC**
12854 Kenan Drive, Suite 145
Jacksonville, FL 32258

# Invoice

MAJORITY STRATEGIES
ELECTIONS • ADVOCACY • BRAND

| BILL TO |
|---|
| Cole Harris<br>CA |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 2018-1002 | 04/30/2018 | $13,290.00 | 04/30/2018 | Due on receipt | |

**STRATEGIST**
Chris Faulkner

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Production & Delivery**<br>Harris_CA_9env_remittance | 2,000 | 0.4975 | 995.00 |
| **Production & Delivery**<br>Harris_CA_YardSign | 500 | 10.29 | 5,145.00 |
| **Production & Delivery**<br>Harris_Cole_Stickers | 10,000 | 0.715 | 7,150.00 |

BALANCE DUE **$13,290.00**

Please ACH or Wire funds to:

Account #: 3111046169
Routing #: 111017979
Texas Capital Bank, N.A.
Dallas, TX

***PLEASE REFERENCE INVOICE NUMBER(S)***

Or send payment to our office via FedEx utilizing our account: 2135-4351-2

12854 Kenan Drive, Suite 145
Jacksonville, Florida 32258

**Majority Strategies, LLC**
12854 Kenan Drive, Suite 145
Jacksonville, FL 32258

# Invoice

MAJORITY STRATEGIES
ELECTIONS • ADVOCACY • BRAND

| BILL TO |
| --- |
| Cole Harris<br>CA |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
| --- | --- | --- | --- | --- | --- |
| 2018-1371 | 05/01/2018 | $25,000.00 | 05/31/2018 | Net 30 | |

**STRATEGIST**
Chris Faulkner

| ACTIVITY | QTY | RATE | AMOUNT |
| --- | --- | --- | --- |
| **Consulting**<br>Campaign Management Fee per MoU | 1 | 25,000.00 | 25,000.00 |

BALANCE DUE **$25,000.00**

Please ACH or Wire funds to:

Account #: 3111046169
Routing #: 111017979
Texas Capital Bank, N.A.
Dallas, TX

***PLEASE REFERENCE INVOICE NUMBER(S)***

Or send payment to our office via FedEx utilizing our account: 2135-4351-2

12854 Kenan Drive, Suite 145
Jacksonville, Florida 32258

**Majority Strategies, LLC**
12854 Kenan Drive, Suite 145
Jacksonville, FL 32258

# Invoice

MAJORITY STRATEGIES
ELECTIONS • ADVOCACY • BRAND

| BILL TO |
|---|
| Cole Harris<br>CA |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 2018-1298 | 05/22/2018 | $12,294.75 | 05/22/2018 | Due on receipt | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Reimbursed expenses**<br>3/04-3/10 | | | 695.31 |
| **Reimbursed expenses**<br>3/11-3/17 | | | 3,852.54 |
| **Reimbursed expenses**<br>3/18-3/24 | | | 4,148.55 |
| **Reimbursed expenses**<br>3/25-3/31 | | | 2,273.51 |
| **Reimbursed expenses**<br>4/01-4/15 | | | 1,324.84 |

BALANCE DUE **$12,294.75**

Please ACH or Wire funds to:

Account #: 3111046169
Routing #: 111017979
Texas Capital Bank, N.A.
Dallas, TX

***PLEASE REFERENCE INVOICE NUMBER(S)***

Or send payment to our office via FedEx utilizing our account: 2135-4351-2

12854 Kenan Drive, Suite 145
Jacksonville, Florida 32258

**Majority Strategies, LLC**
12854 Kenan Drive, Suite 145
Jacksonville, FL 32258

# Invoice

MAJORITY STRATEGIES
ELECTIONS • ADVOCACY • BRAND

| BILL TO |
| --- |
| Cole Harris<br>CA |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
| --- | --- | --- | --- | --- | --- |
| 2018-1372 | 06/01/2018 | $25,000.00 | 07/01/2018 | Net 30 | |

**STRATEGIST**
Chris Faulkner

| ACTIVITY | QTY | RATE | AMOUNT |
| --- | --- | --- | --- |
| **Consulting**<br>Campaign Management Fee per MoU | 1 | 25,000.00 | 25,000.00 |

BALANCE DUE **$25,000.00**

Please ACH or Wire funds to:

Account #: 3111046169
Routing #: 111017979
Texas Capital Bank, N.A.
Dallas, TX

***PLEASE REFERENCE INVOICE NUMBER(S)***

Or send payment to our office via FedEx utilizing our account: 2135-4351-2

12854 Kenan Drive, Suite 145
Jacksonville, Florida 32258

**Majority Strategies, LLC**
12854 Kenan Drive, Suite 145
Jacksonville, FL 32258

# Invoice

MAJORITY STRATEGIES
ELECTIONS • ADVOCACY • BRAND

| BILL TO |
|---|
| Cole Harris<br>CA |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 2018-1407 | 06/01/2018 | $202,525.72 | 06/01/2018 | Due on receipt | |

**STRATEGIST**
Chris Faulkner

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Mobile**<br>Harris_CA_Mobile_FLT 5/30-6/05 | | | 42,000.00 |
| **Web Advertising**<br>Harris_CA_Digital_FLT 5/30-6/05 Social Media | | | 105,400.72 |
| **Web Advertising**<br>Harris_CA_Digital_FLT 5/30-6/05 Desktop | | | 51,975.00 |
| **Web Advertising**<br>Harris_CA_Digital_FLT 5/30-6/05 Search | | | 2,100.00 |
| **Web design**<br>Harris_CA_Digital_FLT 5/30-6/05 | | | 1,050.00 |

BALANCE DUE **$202,525.72**

Please ACH or Wire funds to:

Account #: 3111046169
Routing #: 111017979
Texas Capital Bank, N.A.
Dallas, TX

***PLEASE REFERENCE INVOICE NUMBER(S)***

Or send payment to our office via FedEx utilizing our account: 2135-4351-2

12854 Kenan Drive, Suite 145
Jacksonville, Florida 32258

# Exhibit C

AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
February 6, 2023
CENTRAL DISTRICT OF CALIFORNIA
BY: MR DEPUTY

United States of America

v.

COLE MATTHEW HARRIS,
ROBERT DOUGLAS SPIRO, JR.,
CINDY CHEN, and
YAO LU,

Defendants

Case No. 2:23-mj-00545-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on an unknown date and continuing until at least February 2021, in the county of Los Angeles in the Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. §§ 371, 1001 | Conspiracy to make false statements to a government agency |

This criminal complaint is based on these facts: *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Billie Bender, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: February 4, 2023

*Judge's signature*

City and state: Los Angeles, CA

Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

AUSAs:_MiRi Song (x2262) and Skyler F. Cho (x2475)

**AFFIDAVIT**

I, Billie J. Bender, being duly sworn, declare and state as follows:

**PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of (1) a criminal complaint against Cole Matthew Harris ("HARRIS"); Robert Douglas Spiro Jr. ("SPIRO"); Cindy Chen ("CHEN"), also known as "Chen Ying" and "Meila Chen"; and Yao Lu ("LU") and (2) arrest warrants against HARRIS, CHEN, and LU for conspiracies to make false statements to a government agency, in violation of Title 18, United States Code, Sections 371, 1001.[1]

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

[1] On February 2, 2023, I learned that, earlier that day, SPIRO purchased a ticket to fly from Los Angeles, California, to Dubai on the following day. I suspected that SPIRO might be attempting to flee from prosecution because: (1) based on my knowledge of this investigation, I knew that SPIRO was aware that his conduct was being investigated by the Federal Bureau of Investigation; and (2) SPIRO purchased his ticket the day before his flight was scheduled to depart. On February 3, 2023, investigators executed a probable cause arrest of SPIRO at Los Angeles International Airport. Accordingly, because SPIRO is in custody, I seek arrest warrants only against HARRIS, CHEN, and LU.

statements described in this affidavit are related in substance and part only.

**BACKGROUND OF BILLIE J. BENDER**

3. I am a Special Agent for the Federal Bureau of Investigation ("FBI") and have been so employed since January 2015. As such, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am therefore empowered to conduct investigations of, and to make arrests and serve warrants for, offenses enumerated in 18 U.S.C. §§ 2516, 3052 and 3107.

4. I have received training at the FBI Academy in Quantico, Virginia and have gained experience on the field. As a result, I am familiar with financial investigations, surveillance, interviewing, and other investigative techniques. My training and experience, as well as conversations I have had with other agents and law enforcement officers who specialize in fraud and money laundering investigations, have familiarized me with the many methods of operation that money launderers and fraudsters employ.

5. I am currently assigned to a squad that investigates money laundering and fraud, amongst other federal crimes. Previously, I served as an FBI Special Agent investigating large-scale narcotics trafficking and international money laundering. In my experience, I have conducted investigations using wiretaps, confidential sources, and sophisticated undercover platforms. Additionally, I have participated in

numerous search warrants of physical premises, emails, cloud-based storage systems, and electronic devices. Prior to becoming a Special Agent, I was an Intelligence Analyst assisting the FBI on fraud against the government and public corruption investigations in New York City from 2012 to 2015.

## SUMMARY OF PROBABLE CAUSE

6. Beginning on an unknown date and continuing until at least February 2021, there were agreements between HARRIS, SPIRO, and LU and again among HARRIS, SPIRO, LU, and CHEN to make false statements to the Small Business Administration ("SBA")[2] regarding Deja LLC ("Deja") and Emergency Response Nursing ("ERN"). HARRIS, SPIRO, and LU and HARRIS, SPIRO, CHEN, and LU became members of conspiracies involving Deja and ERN, respectively, knowing of at least one of the objects -- namely, fraudulently obtaining Paycheck Protection Program ("PPP") loans backed by the SBA -- and intending to help accomplish it. The conspiracies involving Deja and ERN were operated and carried out, in substance, in the following manner: (1) one or more co-conspirators would willfully and deliberately apply for a PPP loan, with knowledge that the application contained untrue statements and that such conduct was unlawful; and (2) one or more co-conspirators would prepare writings containing false

[2] The SBA's website describes the Paycheck Protection Program as "[a]n SBA-backed loan that helps businesses keep their workforce employed during the COVID-19 crisis." See "Paycheck Protection Program," available at https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program (last accessed February 3, 2023). Accordingly, I believe that the Deja and ERN PPP loans were matters within the jurisdiction of the SBA.

statements to be submitted as part of the application for PPP loans.

**STATEMENT OF PROBABLE CAUSE**

7. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. The Deja Application**

8. Records from Sunwest Bank reflect that, on or about April 28, 2020, a PPP Borrower Application Form -- namely, SBA Form 2483 -- for Deja (the "Deja Application") was submitted through Sunwest Bank, an authorized lender. The Deja Application reflected that: (1) HARRIS electronically signed the Deja Application; (2) HARRIS was the "managing member" and "100 percent owner" of Deja; (3) Deja had 306 employees; and (4) Deja had an average monthly payroll cost of $1,041,737.

9. I have reviewed the subsequent PPP loan agreement between Sunwest Bank and Deja, which states in pertinent part: "the Borrower will provide to the Lender documentation verifying the number of full-time equivalent employees on the Borrower's payroll as well as the dollar amounts of payroll costs[.]" I have also reviewed five IRS Form 941s (Employer Quarterly Tax Returns) that were submitted with the Deja Application, and they reflected that: (1) Deja had between 302 employees and 400 employees between April 2019 and September 2020; and (2) Deja paid quarterly "wages, tips, and other compensation" between $2,539,696 and $3,197,387 during this time period.

10. However, records from the California Franchise Tax Board show that Deja reported paying zero dollars ($0) in salaries and wages, and zero dollars ($0) in taxable income for both 2019 and 2020. Records from the California Franchise Tax Board also reflect that: (1) HARRIS was listed as the "sole owner" of Deja; and (2) HARRIS signed the 2019 CA Limited Liability Company Tax Form 568 on October 3, 2021, indicating the tax form was completed accurately.

11. Accordingly, based on my knowledge of this investigation, I believe that: (1) Deja was a shell company without active business operations; and (2) HARRIS or a co-conspirator willfully and deliberately submitted the Deja Application, with knowledge both that the Deja Application contained untrue statements -- including false statements about the number of Deja employees and the amount of Deja's average monthly payroll -- and that his or her conduct was unlawful.

12. Records from Sunwest Bank show that Sunwest Bank obtained an SBA-secured loan of $2,604,300 on behalf of Deja, which was approved on or about April 30, 2020, and deposited into a Sunwest Bank account controlled by HARRIS on or about May 12, 2020.

**B. Communications Between Co-Conspirators Around the Time of the Deja Application**

13. In the course of this investigation, investigators obtained multiple federal search warrants and seized communications between HARRIS and SPIRO. I have reviewed these communications, including the following messages that were sent

at or near the date that the Deja Application was submitted and the PPP loan was received:[3]

a. On April 24, 2020, SPIRO sent HARRIS a message via WeChat, a messaging application, which stated: "Right now $5m for our friends & 2m for your loan ... Let's talk tomorrow. We could easily do like $20mm . . . We have it all down. Full process. You should listen in. You'll be on the ground."

b. On April 29, 2020, SPIRO sent HARRIS a message via WeChat: "I just need 2 ID's & Socials. I am so upset. We got you $2.6 mm & Bompton fucked us for $7mm[.]" HARRIS responded, "That's Yao Fucking guy." SPIRO stated: "I'm beyond myself. We have $7mm free money teed up. How do you fuck that up. If you get me 2 names I can get $4-5mm done tomorrow. I'm sending the 3 others to other banks tomorrow."

c. On or about May 8, 2020, HARRIS sent a screenshot of an email to SPIRO using the WhatsApp messaging application. The email subject was "Deja LLC," the sender's email address was "mrcoleharris@gmail.com," and the recipient was "[redacted]@sunwest.com." The email stated, in part: "Thank you for all your help getting this approved. Yao asked me to send you more information on Deja, LLC." SPIRO later replied: "Perfect" and "I'm worried we're going to loose [sic] the other ones if we don't find him." Later, on the same day, SPIRO

[3] Some of the communications discussed in this affidavit were seized from a cellular telephone belonging to SPIRO that was seized during the execution of a federal search warrant. After seizing SPIRO's cellular telephone, investigators asked SPIRO whether he wanted any contact information from his phone, and SPIRO voluntarily provided his passcode.

stated: "He wants me to bring payment for all three loans & I can't tell him Yao is MIA," and "But we have NO way to access the other ones without Yao."

d. Based on my knowledge of this investigation, I believe that: (1) "Yao" is a reference to LU; and (2) these communications show that HARRIS conspired with SPIRO and LU to make false statements in the Deja Application.

**C. The ERN Application**

14. I have reviewed additional records from Sunwest Bank that show that on or about February 2, 2021, Jie Lin ("Lin")[4] electronically signed an application for a PPP loan for ERN (the "ERN Application") in the amount of $1,150,822 from Sunwest Bank. Although the ERN Application reflects that it was electronically signed by Lin, records from Charter Communications reflect that the IP address used to submit the ERN Application -- namely, IP address 23.243.250.169 -- was subscribed to HARRIS, with email addresses charris2766@roadrunner.com and mrcoleharris@gmail.com, and with a service address that I believe is the residence of HARRIS and CHEN based on, among other things, physical surveillance and driver license records for HARRIS and CHEN from the California Department of Motor Vehicles.

[4] In July 2021, Lin and others were indicted in the Southern District of New York with conspiracy to commit money laundering in a separate investigation.

15. The ERN Application claimed that: (1) ERN had 139 employees and (2) ERN's primary business address was 1055 Colorado Blvd., Ste 500, Pasadena, California.

16. I have reviewed four IRS Form 941s (Employer Quarterly Federal Tax Returns), which purportedly reflected the full year of 2019. These forms were submitted with the ERN Application, and they reflected that: (1) ERN had between 137 and 145 employees in 2019; and (2) ERN paid approximately $4,727,084 in "wages, tips, or other compensation" to these employees in 2019. However, records from the California Franchise Tax Board reflect that ERN did not report any payroll taxes or file any business license or registration forms since at least January 2019.

17. Furthermore, the four Employer's Quarterly Federal Tax Returns reflected that the address for ERN was 1968 S. Coast Hwy, Ste. 2398, Laguna Beach, California. However, a Google.com search showed that this address was the location of a "virtual mailbox" service used for collecting mail for entities.

18. Accordingly, based on my knowledge of this investigation, I believe that: (1) ERN was a shell company without active business operations; and (2) HARRIS, CHEN or a co-conspirator willfully and deliberately submitted the ERN Application from the residence of HARRIS and CHEN, with knowledge that the ERN Application contained untrue statements -- including false statements about the number of ERN employees and the amount of ERN's average monthly payroll -- and that such conduct was unlawful.

19. The records from Sunwest Bank show that, Sunwest Bank obtained an SBA-secured loan of $1,150,822 on behalf of ERN, which was deposited into a Sunwest Bank account purportedly controlled by Lin.

20. Because I believe that both Deja and ERN were shell companies without active business operations, I believe that the false statements in the Deja Application and the ERN Application were material to the activities and decisions of the SBA; they had a natural tendency to influence, or were capable of influencing, the agency's decisions or activities.

**D. Communications Between Co-Conspirators Around the Time of the ERN Application**

21. As discussed above, in the course of this investigation, investigators obtained multiple federal search warrants and seized communications.[5] I have reviewed these communications, which include the following:

a. On or about July 31, 2020, LU sent SPIRO a PDF using WeChat titled

---

[5] Based on reports and information from other investigators, I am aware that, in October 2022, during the execution of one of the federal search warrants, investigators seized, among other things, a cellular telephone belonging to CHEN ("CHEN's Telephone"). An investigator saw that CHEN's Telephone had an icon for WeChat. An investigator placed CHEN's Telephone on a table along with other evidence for processing. An investigator told CHEN that CHEN's Telephone was being seized. CHEN later surreptitiously took CHEN's Telephone from that table and drove away. Once investigators realized that CHEN had departed with CHEN's Telephone, an investigator went to a nearby school, found CHEN in her car, and retrieved CHEN's Telephone from her. During a later search of CHEN's Telephone, an investigator saw that the WeChat icon was no longer visible. Accordingly, I believe that CHEN attempted to delete the WeChat application, and CHEN's attempt removed the icon from CHEN's Telephone but did not successfully uninstall the application.

"Citi_Small_Business_Loan_Application_2483_Doc.pdf." The document is a PPP loan application for ERN that lists "Jie Lin" as the Chief Executive Officer and signatory. Based on my knowledge of this investigation, I believe that this communication shows LU and SPIRO's involvement in making false statements to the SBA about ERN.

b. On or about September 25, 2020, SPIRO and HARRIS communicated over WhatsApp. In their WhatsApp conversation on September 25, 2020, HARRIS texted "Yao [LU] not answering," to which SPIRO replied "WTF? Which is that for? He said he's been checking every day." HARRIS then went on to text "Bro. Check WeChat group text. He answered there." "So they need tax return, bank statements, and a voided check." HARRIS then messaged SPIRO a picture of an email addressed to linjie66688@yahoo.com from a representative of Lendio (another SBA approved PPP lender). In the picture, a representative from Lendio wrote to the user of the linjie66688@yahoo.com email account that the additional PPP requirements included 2019 business tax returns, a "voided check," and January 2020 and February 2020 bank statements.

c. Also, on or about September 25, 2020, in a WeChat group chat that included HARRIS, SPIRO, LU and CHEN, CHEN wrote: "Yao, which email did you use for er nursing?" In the same group chat, LU wrote: "They need tax returns, bank statements, and a voided check" and "Should I reply with email or text[.]" CHEN responded: "Can u make them and send to her?" That same day, in the same WeChat group chat, LU asked the group to send

bank statements to the email account "linjie66688@yahoo.com."[6] CHEN wrote: "You have the tax return right?" LU responded: "We have the voided check, need to make the rest." CHEN responded, "So tax returns and bank statements[?]" LU responded, "Yes". Based on my training and experience relating to COVID-19 relief fraud schemes, I believe that these communications show that CHEN asked LU to make fake tax returns, bank statements, and/or a voided check for ERN for the purpose of making false statements to the SBA.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

---

[6] A signature card for a Sunwest Bank business checking account ending in -8442 reflects that Lin was the signatory on the account and his email was "linjie66688@yahoo.com."

## CONCLUSION

22. For all of the reasons described above, there is probable cause to believe that HARRIS, SPIRO, CHEN, and LU have committed violations of Title 18, United States Code, Sections 371, 1001 (conspiracies to make false statement to government agency).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 4th day of
February, 2023.

THE HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

# Exhibit D

Electronically FILED by Superior Court of California, County of Los Angeles 5/19/2023 10:55 PM David W. Slayton, Executive Officer/Clerk of Court, By S. Soto, Deputy Clerk

CHARLES POK, ESQ SBN 254429
LAW OFFICE OF CHARLES POK AND ASSOCIATES
809 S. Garfield Ave.
Alhambra, CA 91801

Tel: (626) 281-0687
Fax: (626) 576-0478

Attorney for Plaintiff Zhenya He

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES, ALHAMBRA COURTHOUSE

| | |
|---|---|
| ZHENYA HE<br><br>Plaintiff,<br><br>vs.<br><br>YING CHEN, an individual; COLE HARRIS, an individual; JONATHAN MEYERS aka JONATHN MERYERS, an individual; HIN KU, an individual; YOU FAN CAO, an individual; and DOES 1 to 10, Inclusive,<br><br>Defendants | **CASE NO. 23AHCV00325**<br><br>**FIRST AMENDED COMPLAINT FOR**<br>**1. CONVERSION**<br>**2. QUIET TITLE**<br>**(VERIFIED)**<br><br>DEMAND FOR JURY TRIAL<br><br>UNLIMITED JURISDICTION |

PARTIES

1. Plaintiff ZHENYA HE is the sole owner of a real property ("Property" hereinafter) commonly known as 1400 Circle Drive, San Marino CA 91108. (Assessor Parcel Number 5326-022-016)
2. Defendants YING CHEN, COLE HARRIS, JONATHAN MEYERS, HIN KU and YOU FAN CAO are all residents of the County of Los Angeles.

## JURISDICTION AND VENUE

3. The subject Property is located at City of San Marino, County of Los Angeles.

## DOE DEFENDANTS

4. The true names or capacities, whether individual, corporate, associate, partnership or otherwise of Defendants, DOE 1 to DOE 10, inclusive, are unknown to Plaintiff who therefore sues said Defendants DOE 1 to DOE 10 by such fictitious names. Plaintiff is informed and believe and thereon alleges that each of the fictitiously named Defendants DOE 1 to DOE 10 designated herein as a DOE is in some actionable manner responsible for the events and happenings referred to herein, either contractually, tortiously or in some other manner caused injury and damages proximately thereby to Plaintiff as here alleged. Plaintiff believes that each of the fictitiously named DOE 1 to DOE 10 is indebted to Plaintiff, and each of them, as alleged in this complaint, and Plaintiff's rights against fictitiously named Defendant DOE 1 to DOE 10 arise from this indebtedness. When Plaintiff ascertains the true names and capacities of DOE 1 to DOE 10, inclusive, Plaintiff will seek leave of court to amend this complaint to show the true names and true capacities of said Defendants DOE 1 to DOE 10.

## GENERAL ALLEGATIONS

5. Plaintiff is informed and believes, and upon such information and belief states all the following allegations in this Complaint.
6. All Defendants worked as a group in a conspiracy to steal the Property from Plaintiff. Plaintiff is informed and believe and thereon alleges that each of the named Defendants is in some actionable manner responsible for the events and happenings referred to herein, either contractually, tortiously or in some other manner caused injury and damages proximately thereby to Plaintiff as here alleged. Plaintiff believes that each of the named Defendants is indebted to Plaintiff, and each of them, as alleged in this complaint, and Plaintiff's rights against each named Defendant arise from this indebtedness.

7. Ying Chen and Cole Harris are husband and wife.

8. Hin Ku and You Fan Cao are husband and wife.

9. Plaintiff owned the property through a single member California LLC named LE SKY GROUP LLC.

10. Plaintiff is the sole owner of this LE SKY GROUP.

11. The fair market value of the Property is about $8,000,000.

12. Plaintiff does not regularly reside at the Property.

13. Plaintiff previously knew Defendants Ying Chen and Cole Harris through another unrelated business transaction. Plaintiff shared with Ying Chen and Cole Harris information on the ownership structure of this Property. Ying Chen and Cole Harris did know that Plaintiff does not regularly reside at the Property.

14. On 09/14/2020, without the knowledge or authorization from Plaintiff, Defendant Jonathan Meyers electronically filed a Statement of Information with California Secretary of State changing the name of LLC Manager and CEO to Defendant Ying Chen. (Exhibit One)

15. On 11/19/2020, without the knowledge or authorization from Plaintiff, Defendant Ying Chen granted the Property to Defendants Hin Ku and You Fan Cao via a Grant Deed without fair consideration. (Exhibit Two)

16. Defendant Ying Chen agreed with Defendants Hin Ku and You Fan Cao to make a payment of $4,550,000.00 outside of escrow in October 2020.

17. By this agreement, Defendant Ying Chen conspired and agreed with Defendants Hin Ku and You Fan Cao to make the majority of the claimed purchased price outside of escrow which Plaintiff reasonably believes to be an act of hiding the stealing of the real property from Plaintiff. Based on this act of payment outside of escrow, Plaintiff reasonably alleges that Defendants Hin Ku and You Fan Cao knew that this transfer of the subject real property is without Plaintiff's

authorization and Defendants Hin Ku and You Fan Cao conspired with Ying Chen to steal the said real property from Plaintiff.

18. Defendants Hin Ku and You Fan Cao also made a payment of more than One Million dollars to Defendant Ying Chen personally in cash in November 2020.

19. Plaintiff reasonably believes the cash payment to Ying Chen personally to be an act of sharing illegal gain from the conspiracy to steal the real property from Plaintiff. Based on this act of payment to Defendant Ying Chen personally, Plaintiff reasonably alleges that Defendants Hin Ku and You Fan Cao knew that this transfer of the subject real property is without Plaintiff's authorization and Defendants Hin Ku and You Fan Cao conspired with Ying Chen to steal the said real property from Plaintiff.

20. On 04/4/2021, without the knowledge or authorized from Plaintiff, Defendants Hin Ku and You Fan Cao pledged the Property as security to obtain a $2,000,000 loan from East West Bank.

21. Defendants, acted as a group with the assistance and full knowledge of Defendant Cole Harris though his name did not appear on any documents. Cole Harris was benefited from Defendants' conspiracy.

22. In 2022, Plaintiff was surprised to learn that her Property was granted to Defendants Hin Ku and You Fan Cao without her knowledge or authorization.

FIRST CAUSE OF ACTION FOR CONVERSION

23. Plaintiff realleges and incorporates all facts and allegations expressed in paragraphs 1-22, inclusive, as if alleged and incorporated herein.

24. Defendants took control of Plaintiff's LLC by filing a fraudulent Statement of Information.

25. Defendants further fraudulently took the title of Plaintiff's Property by granting the Property to co-defendants without fair compensation based on the fraudulent Statement of Information. Each

and every Defendants knew that the transfer was illegal and each Defendant shared illegal gain from this conspiracy.

26. Defendants stole the Property without any compensation to Plaintiff. Each and every Defendants shared the proceeds from this act of stealing.

27. Plaintiff lost the entire $8 million property to Defendants' conspiracy. Plaintiff was greatly damaged by Defendants.

SECOND CAUSE OF ACTION FOR QUIET TITLE

28. The Cross Complainant realleges and incorporates all facts and allegations expressed in paragraphs 1-22, inclusive, as if alleged and incorporated herein.

29. Plaintiff seeks to quiet the title as to the Property (APN 5326-022-016) because Defendants Hin Ku and You Fan Cao knowingly obtained the title of the Property through Fraud and each and every Defendant shared fruit of this stealing.

30. Plaintiff seeks a determination from the Court that Plaintiff is the rightful owner of the Property and the Grant Deed to Defendants Hin Ku and You Fan Cao be declared null and void.

PUNITIVE DAMAGES

31. Defendants' actions were willful, intentional and fraudulent. Defendants performed such acts with such a conscious disregard of Plaintiff's right to her property.

32. Punitive Damages is allowed under California Civil Code Sec. 3294.

PRAYER

Plaintiff respectfully requests that this court, enter a Judgement against Defendants and Does 1-10 and pray the following:

a. General Damages
b. Special Damages
c. Punitive Damages
d. Pre-Judgement Interest on all damages
e. Attorney Fees
f. Cost of Suit
g. For a declaration that Plaintiff is rightful owner of 1400 Circle Drive, San Marino CA 91108 (APN 5326-022-016).

Dated: May 18, 2023

Law Office of Charles Pok

By: [signature]
Charles Pok
Attorney for Zhenya He

Verification (C.C.P 446)

I, Zhengya He am the Plaintiff to this action. I have read the foregoing Plaintiff's Verified First Amended Complaint and know of its contents. The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury of the Laws of the State of California that the foregoing is true and correct.

Executed on May 18, 2023 in Beijing, the People's Republic of China.

何震亚

Zhenya He

# Exhibit One

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

**LLC-12**

20-D67186

# FILED

In the office of the Secretary of State of the State of California

SEP 14, 2020

**This Space For Office Use Only**

**IMPORTANT** — Read instructions **before completing this form.**

**Filing Fee – $20.00**

**Copy Fees** – First page $1.00; each attachment page $0.50; Certification Fee - $5.00 plus copy fees

**1. Limited Liability Company Name** (Enter the exact name of the LLC. If you registered in California using an alternate name, see instructions.)
LE SKY GROUP LLC

| **2. 12-Digit Secretary of State File Number** | **3. State, Foreign Country or Place of Organization** (only if formed outside of California) |
|---|---|
| 201916910292 | CALIFORNIA |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box: 1400 Circle Dr | San marino | CA | 91108 |
| b. Mailing Address of LLC, **if different than item 4a**: 1400 Circle Dr | San marino | CA | 91108 |
| c. Street Address of **California** Office, if Item 4a is not in California - Do not list a P.O. Box: 1400 Circle Dr | San marino | CA | 91108 |

**5. Manager(s) or Member(s)** If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| ying | | chen | |

b. Entity Name - Do not complete Item 5a

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 1400 circle dr | san marinoc | CA | 91108 |

**6. Service of Process** (Must provide either Individual **OR** Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Jonathan | | Meryers | |

| b. Street Address (if agent is not a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 655 n central ave 17th fl | glendale | CA | 91203 |

**CORPORATION** – Complete Item 6c only. Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b

**7. Type of Business**

a. Describe the type of business or services of the Limited Liability Company
investments

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| ying | | chen | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 1400 circle dr | san marino | CA | 91108 |

**9. The Information contained herein, including any attachments, is true and correct.**

| Date | Type or Print Name of Person Completing the Form | Title | Signature |
|---|---|---|---|
| 09/14/2020 | jonathan meyers | vp | |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:



2017 California Secretary of State
www.sos.ca.gov/business/be

# Exhibit Two

This page is part of your document - DO NOT DISCARD

COUNTY OF LOS ANGELES CALIFORNIA

20201526083

Pages: 0003

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

11/25/20 AT 08:00AM

| | |
|---|---|
| FEES: | 25.00 |
| TAXES: | 5,170.00 |
| OTHER: | 0.00 |
| PAID: | 5,195.00 |

LEADSHEET

202011250250094

00019395699

011488196

SEQ:
01

SECURE - 8:00AM

THIS FORM IS NOT TO BE DUPLICATED

E521946

E08_201125_8[illegible]83

**RECORDING REQUESTED BY:**
Chicago Title

**AND WHEN RECORDED MAIL TO:**

Hin Ku and You Fan Cao

**1400 CIRCLE DRIVE**
**SAN MARINO, CA 91108**

THIS SPACE FOR RECORDER'S USE ONLY:

**Title Order No.:** 112020360-EA **Escrow No.:** 200687-JZ
**AP#:** 5325-022-016

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

**DOCUMENTARY TRANSFER TAX is $5,170.00**

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area [X] City of San Marino **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**LE SKY GROUP, LLC, a California Limited Liability Company**

hereby GRANT(s) to:

**Hin Ku and You Fan Cao**, HUSBAND AND WIFE AS JOINT TENANTS

the real property in the City of San Marino, County of Los Angeles, State of California, described as:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF
**Also Known as:** 1400 Circle Drive, San Marino, CA 91108

Dated November 19, 2020

LE SKY GROUP, LLC, a California Limited Liability Company

By: [signature]
Ying Chen, Manager

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF Los Angeles
On Nov 21-th, 2020 before me, Jocelyn Zheng A Notary Public personally appeared Ying Chen who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature [signature] (Seal)

JOCELYN ZHENG
COMM. #2205462
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Exp. JUL 16, 2021

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN ABOVE:

# EXHIBIT "A"

Legal Description

**For APN/Parcel ID(s): 5325-022-016**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN MARINO, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

THOSE PORTIONS OF LOTS 5 AND 6, OF TRACT NO. 2949, IN THE CITY OF SAN MARINO, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 31, PAGES 3 TO 5 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST WESTERLY CORNER OF SAID LOT 6; THENCE NORTH 45° 45' 50' EAST ALONG THE NORTHWESTERLY BOUNDARY LINE OF SAID LOT 6, 201.50 FEET; THENCE SOUTH 41° 15' 30" EAST, 128.18 FEET; THENCE SOUTH 22° 05' 40" WEST 144.85 FEET, TO A POINT IN THE SOUTHWESTERLY LINE OF SAID LOT 6, DISTANT NORTHWESTERLY MEASURED ALONG SAID SOUTHWESTERLY BOUNDARY LINE, 9.62 FEET FROM THE MOST SOUTHERLY CORNER OF SAID LOT 6; THENCE NORTHWESTERLY ALONG SAID SOUTHWESTERLY BOUNDARY LINE OF SAID LOT 6, 200 FEET TO THE POINT OF BEGINNING.

**PROOF OF SERVICE**
**1013A (3) CCP Revised 1/1/88**

STATE OF CALIFORNIA }
COUNTY OF LOS ANGELES }

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 809 S. Garfield Ave. Alhambra CA 91801

On 05/19/2023, I served the foregoing document described as First Amended Complaint and Summons for First Amended Complaint on interested parties in this action as listed below:

Sohaila Sagheb Esq.
Chiao and Wu LLP
600 S. Lake Avenue Ste 405
Pasadena CA 91106

__X__ VIA Email: **ssagheb@chiaowu.com**

_____ VIA FEDERAL EXPRESS

_____ VIA MAIL: By placing a true copy thereof enclosed in a sealed envelope as follows: I am "readily familiar" with firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date in more than 1 day after date of deposit for mailing in affidavit.

____ BY PERSONAL SERVICE Messenger Service delivered such envelope by hand to the office of the addressee.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on 05/19/2023, at Alhambra, California.

Charles Pok